**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Blair E. Reed (State Bar No. 316791)
Brittany S. Scott (State Bar No. 327132)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
          breed@bursor.com
          bscott@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
2665 S. Bayshore Dr., Suite 220
Miami, FL 33133-5402
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: scott@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAYONNA BREZINSKI, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>GRACO CHILDREN'S PRODUCTS, INC. and NEWELL BRANDS DTC, INC.,<br>Defendants. | Case No.   5:20-cv-00347<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

CLASS ACTION COMPLAINT

Plaintiff Nayonna Brezinski ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendants Newell Brands DTC, Inc. ("Newell") and Graco Children's Products, Inc. ("Graco") (together, "Defendants") for the manufacture, marketing, and sale of the Graco Little Lounger Rocking Seat, the Graco Duet Glide LX Baby Infant Gliding Swing and Napper/Portable Sleeper, and the Graco DreamGlider Gliding Seat and Sleeper. Plaintiff makes the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a class action against Defendants Newell Brands DTC, Inc. and Graco Children's Products, Inc. for the manufacture and sale of Graco Little Lounger Rocking Seats (the "Little Lounger"), the Duet Glide LX Baby Infant Gliding Swing and Napper/Portable Sleeper (the "Duet Glide"), and the DreamGlider Gliding Seat and Sleeper (the "DreamGlider") (collectively the "Inclined Sleepers") all of which were marketed as suitable for infants.

2.      Infants up to 1 year of age sleep between 16 and 14 hours per day. Newborn infants sleep up to 8 hours during the day.[1]  Infants ranging from 3 months to 1-year sleep between 3 to 5 hours during the daytime.

3.      As such, infant loungers (*i.e.* sleepers) are highly desirable for parents because they are designed to let babies rest comfortably, without the need for a crib or mattress. Because babies sleep more than 50% of the day, parents seek easily transportable sleepers believing that it is safe for the babies to sleep or nap in them while they carry out daily tasks. Defendants designed, manufactured, marketed and sold the Inclined Sleepers to meet this demand.

4.      Defendants designed, manufactured, distributed, marketed, and sold three nearly identical products, all of which qualify as "sleepers:"

[1] https://www.stanfordchildrens.org/en/topic/default?id=infant-sleep-90-P02237

a. The Little Lounger is an inclined infant "lounge" that is advertised as such. The name "Lounger" is prominently displayed on the boxes in which the Lounges are sold. Additionally, other materials used to promote the Lounges exclaim, "[t]hat this product was designed with your baby's comfort in mind," and that "the cushioned deep seat has an adjustable recline so that you can find just the right position for your little one." Other materials make similar statements about the Little Lounger's suitability for infants. This marketing was dangerously false and misleading, as the product is not safe for infants.

b. The Duet Glide is an inclined infant "sleeper" that is advertised as such. The name "Napper" or "Portable Sleeper" has been prominently displayed on the boxes in which the Duet Glide is sold. Additionally, other materials used to promote the Duet Glide exclaim, that "seat conveniently doubles as a portable napper" and that the Duet Glide offers "3 position recline for optimal comfort." Other materials make similar statements about the Duet Glide's suitability for infants. This marketing was dangerously false and misleading, as the product is not safe for infants.

c. Similarly, the DreamGlider is an inclined infant "sleeper" that is advertised as such. The name "Sleeper" is prominently displayed on the boxes in which the DreamGliders are sold. Additionally, other materials used to promote the DreamGliders exclaim, that "the plush and roomy reclining seat makes nap time extra cozy" and that parents can "gently lower the swing seat to create a cozy, reclined sleep space [for] baby." Other materials make similar statements about the DreamGlider's suitability for infants. This marketing was dangerously false and misleading, as the product is not safe for infants.

5.      The Inclined Sleepers are inherently unsafe and unfit for their intended use.  Their use poses a number of serious safety risks that can lead to infant death and injury.  By positioning an infant at an incline between 10 and 30 degrees, the Inclined Sleepers significantly increases the risk that the infant's head will slip into a dangerous position, tilt to constrict the windpipe and/or cause the infant's face to become pressed against the padded fabric in the lounge and block airflow, which the infant may be unable to correct.  This increases the risk of death by asphyxiation.

6.      Defendants knew about these risks for as long as they sold the Inclined Sleepers.  Among other things: (1) the American Academy of Pediatrics  ("AAP") and other consumer groups repeatedly issued warnings about the serious dangers of inclined sleepers and (2) in April 2019 the Consumer Product Safety Commission ("CPSC") began working with manufacturers to recall inclined sleepers because of their associated sleeping risks.  Despite these recalls and the known risks associated with inclined baby products, Defendants did not issue a recall of the Little Lounger until January 29, 2020, more than nine months after it became public knowledge that inclined sleepers are unsafe for infants.  Defendants have not recalled the DreamGlider.

7.      On January 29, 2020, after warnings from the CPSC and other agencies and groups as described herein, Defendants recalled approximately 111,000 Little Loungers.

8.      Plaintiff brings claims against Defendants individually and on behalf of a class of similarly situated purchasers of the Little Loungers for (1) fraud; (2) unjust enrichment; (3) breach of express warranty; (4) breach of implied warranty; (5) violation of California's Consumer Legal Remedies Act ("CLRA"), Cal. Civil Code § 1750, *et seq.;* (6) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (7) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*

## PARTIES

9.      Plaintiff Nayonna Brezinski is, and at all times relevant to this action has been, a resident of Moreno Valley, California.  On July 10, 2018, Ms. Brezinski purchased Defendants' Little Lounger Rocking Seat from a Walmart store located in Moreno Valley, California.  Before purchasing the Little Lounger, Ms. Brezinski saw, read, and relied on Defendants' representations that the Little Lounger was suitable for infants.  Ms. Brezinski would not have purchased the Little Lounger had she known that there was a significant risk that the Little Lounger was dangerous and unfit to perform its intended purpose.

10.     Defendant Newell Brands DTC, Inc. is a Delaware corporation with its principal place of business at 6655 Peachtree Dunwoody Road, Atlanta, GA, 30328. Newell manufactures, markets, and distributes the Inclined Sleepers throughout the United States.

11.     Defendant Graco Children's Products, Inc. is a Delaware corporation with its principal place of business at 6655 Peachtree Dunwoody Road, Atlanta, GA, 30328.  Graco Children's Products is a wholly owned subsidiary of Newell.  Graco manufactures, markets, and distributes the Inclined Sleepers throughout the United States.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendants.

13.     This Court has personal jurisdiction over Defendant Newell Brands because Newell conducts substantial business within California such that Defendant has significant, continuous, and pervasive contacts with the State of California. Newell is registered to do business in the State of California.

14.     This Court has personal jurisdiction over Defendant Graco Children's Products, Inc. because Graco conducts substantial business within California such that Defendant has significant, continuous, and pervasive contacts with the State of California.  Graco is registered to do business in the State of California.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do substantial business in this District and a substantial part of the events giving rise to Plaintiff Brezinski's claims took place within this District.

## COMMON FACTUAL ALLEGATIONS

16.     Defendants are some of the world's most recognized and trusted baby product companies.  They tout that "their approach to caregiving stems from a heritage of innovation designed around safety, durability, and the best intentions of loving parents."  Their "number one priority is safety for the children who depend on their products every day."

17.     Defendants' Inclined Sleepers are popular because they combine the features of a rocking seat with the features of an infant sleeper.

18.     Inclined sleepers "are elevated, intended to be placed on the floor, and are self-supporting.  Typically, this design uses a metal frame covered by a fabric insert that contains the occupant.  Some frame-type products have a rigid plastic insert under the sleeping surface, and/or extra padding with head positioning cushions.  The base may be stationary or allow side-to-side/head-to-toe rocking.  This type of product could have a fixed incline or be adjustable.  Frame-type products can be intended for use by newborns or infants, or both, depending on the size of the product."[2]

19.     Under the definition described above, the Little Lounger, DreamGlider, and Duet Glide are all inclined sleepers that incline upwards on one end to raise a baby's head and torso up to between 10 and 30 degrees.  The Inclined sleepers are

---

[2] https://www.cpsc.gov/s3fs-public/SupplementalNoticeofProposedRulemaking forInfantSleepProducts_10_16_2019.pdf (last accessed February 18, 2020).

nearly identical in design and all serve identical purpose.  As of October 16, 2019, the CPSC was aware of 451 – 59 fatal and 392 nonfatal – incidents relating to infant inclined sleep products that occurred from January 1, 2005 through June 30, 2019.

          

**Left: Little Lounger          Middle: Duet Glide          Right: DreamGlider**

20.     The Inclined Sleepers all feature tabs that parents pull to lift the Inclined Sleepers from a supine position to an inclined position, elevating an infants' head up to a 30-degree angle from the lowest part of the baby's torso.  The sleeper also feature multi-point restraints, which are intended to limit the baby's motion at the hips and waist.  They also feature hard plastic external shells covered in plush padding upon which the baby is placed.  The different models of the Inclined Sleepers share this basic design.

21.     None of the Inclined Sleepers warn parents that the Inclined Sleepers should be lowered to a horizontal position when infants are asleep.

22.     The CPSC classifies the Little Lounger as an inclined sleeper.[3]

_____

[3] https://www.cpsc.gov/SafeSleep (last accessed February 18, 2020).

23.     The Little Lounger's design also mirrors the design of other inclined sleepers that have been recalled, including the Fisher -Price Rock N' Play:

 

**Left: Fisher-Price Rock 'N Play          Right: Graco Little Lounger**

24.     Defendants, who designed, manufactured, marketed and sold the Inclined Sleepers have known of the risks posed by the product throughout the time they designed, manufactured, marketed and sold the Inclined Sleepers.  They, nonetheless, continued to market them for years as safe environments for sleep for infants, placing thousands of infants at risk.

25.     Despite knowing that the Inclined Sleepers are unsafe for sleeping infants, Defendants marketed and sold the products as suitable for infants.  In fact, the DreamGlider's packaging features "sleeper" and "sleep" on the packaging in multiple places.  Similarly, the packaging features a sleeping infant.  The Duet Glide claims that the seat "doubles as a portable napper for use throughout the house."  The Little Loungers promise that parents will "find just the right position for baby's comfort with the multi-position reclining seat."

26.     In their January 29, 2020 recall, Defendants admit that they recalled the Little Lounger because of infant fatalities "reported with other manufacturers'

inclined sleep products." As such, Defendants themselves consider the Little Lounger an inclined sleeper.[4]

27.     In 2019, after the danger of inclined sleepers became public knowledge, Defendants renamed the DreamGlider, quietly removing "& Sleeper" from its name. Defendants did not issue a recall for the product and continued to sell versions of the product with packaging containing the "& Sleeper" title.

28.     Defendants have not recalled the Duet Glide.

## I.     Infant Safety And Warnings To Defendants

29.     The National Institutes of Health ("NIH") of the United States Department of Health and Human Services and other federal and national organizations have worked with the AAP, a non-profit group with a membership of 66,000 primary care pediatricians, pediatric medical subspecialists and pediatric surgical specialists, to develop safe sleep standards for babies.[5]  Defendants, as manufacturers and marketers of widely sold infant sleepers, are well aware of NIH and AAP standards.

30.     In 1992, before Defendants introduced the Inclined Sleepers to the U.S. market, the American Academy of Pediatrics ("AAP") released its recommendation that babies should be placed on their backs to sleep. Subsequently, while deaths from sudden infant death syndrome (SIDS) decreased, infant deaths from other causes including suffocation, entrapment, and asphyxia did not.

31.     In November 2005, the AAP issued a Policy Statement entitled – *The Changing Concept of Sudden Infant Death Syndrome: Diagnostic Coding Shifts, Controversies Regarding the Sleeping Environment, and New Variables to Consider*

---

[4] https://www.cpsc.gov/Recalls/2020/Graco-Recalls-Little-Lounger-Rocking-Seats-to-Prevent-Risk-of-Suffocation (last accessed February 18, 2020).

[5] https://www.nih.gov/news-events/news-releases/federal-agencies-express-support-updatedsafe-infant-sleep-recommendations (last visited February 18, 2020).

*in Reducing Risk* – which contained detailed guidelines and recommendations on safe sleep for infants.[6]  These included:

- "Back to sleep: ***Infants should be placed for sleep in a supine position (wholly on the back) for every sleep.*** (Emphasis added).

- "Use a firm sleep surface: ***Soft materials or objects . . . should not be placed under a sleeping infant.***  A firm crib mattress, covered by a sheet, is the recommended sleeping surface."

32.    In January 2006, the NIH issued a news release adopting the AAP's Guidelines.[7]  Among other things, the NIH stated:

The [AAP] recently issued updated recommendations for reducing the of SIDS:

- Always place your baby on his or her back to sleep, for naps and at night

- Place your baby on a firm sleeping surface, such as on a safety-approved crib mattress, covered by a fitted sheet.

33.    In October 2011, the AAP issued an updated Policy Statement, which expanded the guidelines and recommendations on safe sleep for babies.[8]  The recommendations stated:

- Infants should be placed "back to sleep for ***every*** sleep" in the supine position, wholly on his or her back. "The supine sleeping position does not increase the risk of choking and aspiration in infants, even those with gastro-esophageal reflux."

---

[6] https://pediatrics.aappublications.org/content/116/5/1245 (last accessed February 18, 2020).

[7] https://www.nichd.nih.gov/newsroom/releases/sids_winter (last accessed February 18, 2020).

[8] https://pediatrics.aappublications.org/content/128/5/1030 (last accessed February 18, 2020).

- "***Elevating the head of the infant's crib while the infant is supine is not recommended.*** It is ineffective in reducing gastroesophageal reflux; in addition, it might result in the infant sliding to the foot of the crib into a position that might compromise respiration."

- "Although data to make specific recommendations as to when it is safe for infants to sleep in the prone or side position are lacking, studies that have established prone and side sleeping as risk factors for SIDS include infants up to 1 year of age. Therefore, infants should continue to be placed supine until 1 year of age. Once an infant can roll from supine to prone and from prone to supine, the infant can be allowed to remain in the sleep position that he or she assumes."

- "Use a firm sleep surface—A firm crib mattress, covered by a fitted sheet, is the recommended sleeping surface to reduce the risk of SIDS and suffocation."

- "A crib, bassinet, or portable crib/play yard that conforms to the safety standards of the Consumer Product Safety Commission…is recommended."

- "Soft materials…should not be placed under a sleeping infant."

- "*Sitting devices*, such as car safety seats, strollers, swings, infant carriers, and infant slings, ***are not recommended for routine sleep in the hospital or at home.*** Infants who are younger than 4 months are particularly at risk, because they might assume positions that can create risk of suffocation or airway obstruction."

(Emphasis added).

34.     On October 24, 2016, the AAP issued a further updated policy statement – *SIDS and Other Sleep-Related Infant Deaths: Updated 2016 Recommendations for a Safe Infant Sleeping Environment* – reaffirming and further

developing the guidelines and recommendations on safe sleep for babies.[9] The recommendations included:

- *"Recommendations for a safe sleep environment include **supine positioning, the use of a firm sleep surface**, . . . **and the avoidance of soft bedding** . . . ."*
- ***"[M]anufacturers should follow safe sleep guidelines in their messaging and advertising."***
- "If an infant falls asleep in a sitting device, ***he or she should be removed from the product and moved to a crib or other appropriate flat surface as soon as is safe and practical.***"
- *"Media and manufacturers should follow safe sleep guidelines in their messaging and advertising. . . . Media and advertising messages contrary to safe sleep recommendations may create misinformation about safe sleep practices."*

(Emphasis added).

35.     On October 16, 2019, the CPSC issued a Draft Supplemental Notice of Rulemaking with respect to inclined infant sleep products  which "proposes to limit the seat back angle for sleep to 10 degrees or less, and to change the scope of the standard to cover products intended for infant sleep that are not already addressed by another standard."[10]  This would have the effect of banning the Inclined Sleepers because it places the infant to sleep at angles between 10 and 30 degrees.  The Supplemental Notice of Rulemaking further disclosed that 59 infant fatalities were reported to the CPSC in connection with inclined infant sleep products.

---

[9] https://pediatrics.aappublications.org/content/138/5/e20162938 (last accessed February 18, 2020).  Although issued on October 24, 2016, the recommendations are dated November 2016.

[10] https://www.cpsc.gov/s3fs-public/SupplementalNoticeofProposedRulemaking forInfantSleepProducts_10_16_2019.pdf (last accessed February 18, 2020).

36.     The Inclined Sleepers are not cribs or mattresses.  They feature raised soft padding and can be positioned to an angle similar to that of a car seat or carrier. Simply put, they are unsafe under AAP and NIH Guidelines.

37.     Despite these numerous warnings, Defendants marketed and sold the Inclined Sleepers, which position infants at varying levels of incline, in restraints, and on soft padded material, as a suitable sleeping environment for infants.

38.     Further, Although Defendants knew of the AAP's warning that "manufacturers should follow safe sleep guidelines in their messaging and advertising," and advertising messages contrary to safe sleep recommendations may create misinformation about safe sleep practices," Defendants continued to market and sell the Inclined Sleepers as suitable for infants.

## II.     **The Inadequate and Belated Recall**

39.     On January 29, 2020, more than three months after the CPSC issued its notice of rulemaking, Defendant issued the first, and only, recall for its Inclined Sleepers (the "Recall")  The recall was limited to the Little Lounger.  To date, Defendant has not recalled the Duet Glide or the DreamGlider.

40.     In the recall notice, Defendants stated that the recall was initiated because "*Infant fatalities have been reported with other manufacturers' inclined sleep products*, after infants rolled from their back to their stomach or side, or under other circumstances."[11]  (Emphasis added).

41.     However, product recalls have a notoriously low level of participation. This recall is designed to be no different.  Defendants' Recall is cumbersome, inconvenient, restrictive, and confusing to the general public.  Parents who own the product must submit an online form to initiate the recall process and receive a recall kit.  When parents receive the recall kit, they are required to cut out a portion of the product padding and mail it back to Graco.

---

[11] https://www.cpsc.gov/Recalls/2020/graco-recalls-little-lounger-rocking-seats-to-prevent-risk-of-suffocation (last accessed February 18, 2020).

42.    Defendants have been on notice of the risks associated with the Inclined Sleepers for years and did nothing about it.  The Recall is insufficient because it is calculated to ensure as few returns as possible.

### III.    Defendants' Deceptive Advertising and Marketing

43.    Despite their knowledge of the AAP's guidelines and consumer groups' recommendations that babies sleep supine, that their heads not be elevated, that they sleep on a firm surface without soft materials, and that inclined sitting devices such as car seats, strollers, swings, infant carriers, and infant slings are not recommended for routine sleep, that the parents should be warned to remove their infants from inclined sleepers if they fall sleep, Defendants have marketed – and in the case of the DreamGlider and Duet Glider – continue to market the Inclined Sleepers as suitable for infants.

44.    Defendants' deceptive advertising of the Inclined Sleepers takes two primary forms: online and in-store.  Online advertising appears on the Graco website as well as other websites where the product was sold (such as Amazon.com).  In store advertising appears in the numerous stores where the Inclined Sleepers are sold.

45.    Defendants' deceptive advertising of the Inclined Sleepers starts with their names: "Lounge," "Sleeper," and "Portable Sleeper."  By naming the products as such, Defendants misled consumers into believe that the products are safe and suitable for babies to sleep.  A reasonable consumer would assume that the Inclined Sleepers' designs are consistent with the applicable guidelines and recommendations about how babies should be safely placed to sleep.  As described above, the Inclined Sleepers are unfit for use as infant sleepers.

46.    The marketing statements conflict with the AAP's Guidelines and recommendations, and those of other infant sleep experts.

47.    For example, Defendants' statements that the Little Lounger "has multiple recline positions, so that it's easy to find the right position for baby's comfort" is in contrast to the AAP's guidelines and recommendations that babies

sleep supine and that their heads not be elevated.  The DreamGlider features a similar claim, stating that the "seat reclines with an easy, one-hand motion, giving your baby a safe and comfortable spot to rest without having to be moved from the swing."  The Duet Glider claims that the "seat conveniently doubles as a portable napper," with "3 position recline for optimal comfort."

48.     Defendants' statement that the Little Lounger has "comfortable, plush fabric" is also contrary to the AAP's guideline and recommendation that soft materials should not be placed under a sleeping infant.  Defendants make similar claims regarding the DreamGlider, stating that the "cozy seat combined with plush body support and a three-position recline offers optimal comfort for baby."  The Duet Glider also includes these claims stating that the product has "plush softgoods with full body support for added comfort."

49.     Further, Graco has sponsored reviews of the Inclined Sleepers, perpetuating the claim that the Inclined Sleepers are suitable for infant sleep.  For example, in September 2013, one paid reviewer stated that the Little Lounger would be perfect for "sleeping, resting, rocking, and vibrating" and that they used the Little Lounger "in place of a bassinet."  Another sponsored review from November 2013 claimed that the Little Lounger "is what the baby will sleep in at night."

50.     Defendants' deceptive marketing of the products as suitable for infant "lounging or sleeping" is material to consumers' decisions to purchase and/or own the Inclined Sleepers, because it causes consumers to reasonably believe the product is safe.  Defendants should not have marketed, and should not be marketing, the Inclined Sleepers as suitable for infants.  Alternatively, Defendants should have disclosed in their marketing statements that using the products for sleep is dangerous and contrary to medical guidelines and recommendations because this information would be material to a consumer's decision as to whether to purchase and/or own the Inclined Sleepers.

51.     Defendants' deceptive marketing of the Inclined Sleepers, as suitable for infant "lounging or sleeping" when its use as such conflicts with the applicable medical guidelines and recommendations not only exposed Class members' infants to serious risk of injury and even death, but it also induced consumers who would not have otherwise purchased the Inclined Sleepers to purchase it, to own, and/or pay a higher price than they would have otherwise paid for the product were it not false or misleadingly advertised.

52.     Defendants' marketing has led consumers of the Inclined Sleepers to believe that the products have been tested, comply with all applicable regulations and laws, and are fit for their intended use.

53.     Defendants profited enormously from their failure to disclose the risk of the Inclined Sleepers to consumers, and from their affirmative statements representing that the Inclined Sleepers are suitable for infants.

## CLASS REPRESENTATION ALLEGATIONS

54.     Plaintiff Brezinski seeks to represent a class defined as all persons in the United States who purchased the Inclined Sleepers from February 25, 2016 to the present (the "Class").  Excluded from the Class are persons who made such purchases for purpose of resale.

55.     Plaintiff Brezinski also seeks to represent a subclass of all Class Members who purchased the Inclined Sleepers in the State of California (the "California Subclass").

56.     Members of the Class and California Subclass are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class and California Subclass number in the tens or hundreds of thousands. The precise number of Class Members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class Members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants and third-party retailers and vendors.

57.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include, but are not limited to:

a.     whether Defendants misrepresented and/or failed to disclose material facts concerning the Products;

b.     whether Defendants' conduct was unfair and/or deceptive;

c.     whether Defendants have been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendants to retain the benefits conferred upon Defendants by Plaintiff and the Class;

d.     whether Plaintiff and the Class have sustained damages with respect to the common law claims asserted, and if so, the proper measure of their damages.

58.     Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, purchased, in a typical consumer setting, Defendants' Inclined , and Plaintiff sustained damages from Defendants' wrongful conduct.

59.     Plaintiff will fairly and adequately protect the interests of the Class and Subclass and has retained counsel that is experienced in litigating complex class actions.  Plaintiff has no interests which conflict with those of the Class or the Subclass.

60.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

61.     The prosecution of separate actions by members of the Class and the Subclass would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants.  For example, one court might enjoin Defendants from performing the challenged acts, whereas another might not. Additionally, individual actions could be dispositive of the interests of the Class and

the Subclass even where certain Class or Subclass members are not parties to such actions.

## COUNT I
### (Fraud)

62.    Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

63.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class and Subclass against Defendants.

64.    This claim is based on fraudulent representations and omissions concerning the safety of consumers who use the Inclined Sleepers.  As discussed above, Defendants failed to disclose that the risks associated with the intended use of the Inclined Sleepers, or that the risks were substantially likely to manifest through the customary and intended use of the Inclined Sleepers.  Defendants also represented the Inclined Sleepers as safe for infants, which they were not.

65.    The false and misleading representations and omissions were made with knowledge of their falsehood.  Defendants are nationwide children's product distributors who knew of reports of the Inclined Sleepers' dangerous nature. Nonetheless, Defendants continued to sell their worthless and dangerous Inclined Sleepers to unsuspecting consumers.

66.    The false and misleading representations and omissions were made by Defendants, upon which Plaintiff and members of the proposed Class and Subclass reasonably and justifiably relied, and were intended to induce and actually induced Plaintiff and members of the proposed Class and California Subclass to purchase the Inclined Sleepers.

67.    The fraudulent actions of Defendants caused damage to Plaintiff and members of the proposed Class and Subclass, who are entitled to damages and other legal and equitable relief as a result.

**COUNT II**
**(Unjust Enrichment)**

68.     Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

69.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class and Subclass against Defendants.

70.     Plaintiff and Class members conferred benefits on Defendants by purchasing the Inclined Sleepers.

71.     Defendants have been unjustly enriched in retaining the revenues derived from Plaintiff's and Class members' purchases of the Inclined Sleepers. Retention of those moneys under these circumstances is unjust and inequitable because Defendants failed to disclose that the Inclined Sleepers were unfit for their intended use, or that the risks were substantially likely to manifest through the customary and intended use of the Inclined Sleepers.  These omissions caused injuries to Plaintiff and Class members because they would not have purchased the Inclined Sleepers if the true facts were known.

72.     Retention of those moneys also is unjust and inequitable because, as alleged above, Defendants commenced an ineffective recall that was calculated to result in few returns, and generally no refunds, thereby protecting profits Defendants collected from selling the Inclined Sleepers.

73.     Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiff and Class members is unjust and inequitable, Defendants must pay restitution to Plaintiff and Class members for its unjust enrichment, as ordered by the Court.

**COUNT III**
**(Breach of Express Warranty)**

74.     Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

75.     Plaintiff brings this claim individually and on behalf of the members of

the proposed Class and Subclass against Defendants.

76.     Defendants are, and at all relevant times were, a merchant engaged in the business of manufacturing and distributing, among other things, Inclined Sleepers.  Defendants sold the Inclined Sleepers in the regular course of business and Plaintiff and Class members purchased the Inclined Sleepers.

77.     Defendants expressly warranted to all consumers that the Inclined Sleepers were appropriate and safe for infant use, which became the basis of the bargain between Defendants and Plaintiff and Class members.

78.     Defendants gave these express warranties to Plaintiff and Class members in written form on the packaging of the Inclined Sleepers as well as through the marketing and advertising described herein.

79.     Defendants' written affirmations of fact, promises, and/or descriptions as alleged are each a written warranty.

80.     Defendants breached their express warranties because their representations and statements alleged herein are false and the Inclined Sleepers did not contain the properties Defendants represented.  Despite warranting the Inclined Sleepers as suitable for infant use, Defendants knew that there were risks associated with the Inclined Sleepers and failed to inform Plaintiff and the Class members as such.

81.     By placing the Inclined Sleepers in the stream of commerce, Defendants further warranted that the Inclined Sleepers were safe to use and complied with applicable guidelines.

82.     Defendants breached their warranties because, contrary to their representations, the Inclined Sleepers are not suitable for infant use, and do not comply with applicable guidelines and recommendations for safe infant use.

83.     As a direct and proximate result of this breach of warranty by Defendants, Plaintiff and other consumers have been damaged by paying monies for products that are completely unusable.  Plaintiff seeks damages in an amount to be

proven at trial for the injuries suffered from Defendants' breach of express warranties.  The damages suffered by Plaintiff and the Class Members include, but are not limited to, the monies paid to Defendants for the Inclined Sleepers.

## COUNT IV
### (Breach of Implied Warranty of Fitness and Merchantability)

84.    Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

85.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class and Subclass against Defendants.

86.    Defendants are, and at all relevant times were, a merchant engaged in the business of manufacturing and distributing, among other things, the Inclined Sleepers

87.    Plaintiff and the Class Members purchased the Inclined Sleepers.

88.    Defendants are manufacturers and merchants with respect to goods of this kind, which were sold to Plaintiff and other consumers, and there was in the sale to Plaintiff and other consumers an implied warranty that those goods were merchantable and that they were fit for their intended use as infant sleepers.

89.    However, Defendants breached that warranty implied in the contract for the sale of goods in that the Inclined Sleepers are completely unusable, lack even the most basic degree of fitness for ordinary or intended use, and are not safe for human use as set forth in detail herein above.

90.    The Inclined Sleepers are defective and unusable because they were distributed to the public with extreme safety risks, and because those risks were substantially likely to manifest through the customary and intended use of the Inclined Sleepers.  As a result, the Inclined Sleepers were not usable and dangerous to the health and well-being of its consumers.

91.    Defendants admitted that the Little Loungers were completely unusable and unfit for normal use when it initiated the Recall described in detail herein above.

92.     As a direct and proximate result of this breach of warranty by Defendants, Plaintiff and other consumers have been damaged by paying monies for products that are completely unusable and unfit for their intended purpose.

93.     Plaintiff seeks damages in an amount to be proven at trial for the injuries suffered from Defendants' breach of the implied warranties.  The damages suffered by Plaintiff and the Class Members include, but are not limited to, the monies paid to Defendants for the Inclined Sleepers.

94.     As a result of Defendants' conduct, Plaintiff did not receive goods as impliedly warranted by Defendants to be merchantable.

## COUNT V
**(Violation Of California's Consumers Legal Remedies Act ("CLRA"),
Cal. Civil Code §§ 1750, *et seq.*)**

95.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

96.     Plaintiff Brezinski brings this claim individually and on behalf of the California Subclass against Defendants.

97.     California's Consumers Legal Remedies Act, Cal. Civ. Code § 1770(a)(5), prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status affiliation, or connection which he or she does not have."

98.     California's Consumers Legal Remedies Act, Cal. Civ. Code § 1770(a)(7), prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

99.     California's Consumers Legal Remedies Act, Cal. Civ. Code § 1770(a)(9) disallows "[a]dvertising goods or services with intent not to sell them as advertised."

100.   Defendants violated this provision by misrepresenting that the Inclined Sleepers were safe for infants.

101.   Plaintiff Brezinski and the California Subclass suffered injuries caused by Defendants because: (a) they would not have purchased the Inclined Sleepers on the same terms if the true facts were known about the product; (b) they paid a price premium for the Inclined Sleepers due to Defendants' promises that they were suitable for infants; and (c) the Inclined Sleepers do not have the characteristics as promised by Defendants.

102.   On February 19, 2020, prior to the filing of this Complaint, Plaintiff's counsel sent Defendants a notice letter, which complies in all respects with California Civil Code §1782(a).  The letter was sent via certified mail, return receipt requested, advising Defendants that it was in violation of the CLRA and demanding that it cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter stated that it was sent on behalf of Plaintiff Brezinski, and all other similarly situated purchasers.  Defendants did not respond to the letter.

### COUNT VI
**(Violation Of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

103.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

104.   Plaintiff Brezinski brings this claim individually and on behalf of the members of the California Subclass against Defendants.

105.   Defendants are subject to California's Unfair Competition Law, Cal. Bus & Prof. Code §§ 17200, et seq.  The UCL provides, in pertinent part: "Unfair Competition shall mean and include unlawful, unfair, or fraudulent business practices and unfair, deceptive, untrue, or misleading advertising …."

106.   Defendants' misrepresentations and other conduct, described herein,

violated the "unlawful" prong of the UCL by violating the CLRA as described herein; the FAL as described herein; and Cal. Com. Code § 2607.

107.   Defendants' misrepresentations and other conduct, described herein, violated the "unfair" prong of the UCL in that their conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the gravity of the conduct outweighs any alleged benefits.

108.   Defendants violated the "fraudulent" prong of the UCL by making misrepresentations about the Inclined Sleepers, as described herein.

109.   Plaintiff Brezinksi and the California Subclass lost money or property as a result of Defendants' UCL violations because: (a) they would not have purchased the Inclined Sleepers on the same terms if the true facts were known about the product; (b) they paid a price premium for the Inclined Sleepers due to Defendants' promises that they suitable for infants; and (c) the Inclined Sleepers do not have the characteristics as promised by Defendants.

### COUNT VII
**(Violation Of California's False Advertising Law ("FAL"),
Cal. Bus. & Prof. Code §§ 17500, *et seq.*)**

110.   Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

111.   Plaintiff Brezinski brings this claim individually and on behalf of the members of the California Subclass against Defendants.

112.   California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, et seq., makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state,  …in any advertising device … or in any other manner or means whatever, including over the Internet, any statement, concerning … personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is

known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

113.   Defendants committed acts of false advertising, as defined by § 17500, by misrepresenting that the Inclined Sleepers are safe for infants.

114.   Defendants knew or should have known, through the exercise of reasonable care that its representations about the Inclined Sleepers were untrue and misleading.

115.   Defendants' actions in violation of § 17500, as described herein, were false and misleading such that the general public is and was likely to be deceived.

116.   Plaintiff Brezinski and the California Subclass lost money or property as a result of Defendants' FAL violations because: (a) they would not have purchased the Inclined Sleepers on the same terms if the true facts were known about the product; (b) they paid a price premium for the Inclined Sleepers due to Defendants' promises that they were suitable for infants; and (c) the Inclined Sleepers do not have the characteristics as promised by Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

a)   For an order certifying the Class and the California Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff Brezinski as a representative of the Class and the California Subclass, and Plaintiff's attorneys as Class Counsel to represent the Class and California Subclass;

b)   For an order finding in favor of Plaintiff, the Class, and the California Subclass on all counts asserted herein;

c)   For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

d)   For prejudgment interest on all amounts awarded;

1

e)     For an order of restitution and all other forms of equitable monetary

2
         relief;

3

f)     For injunctive relief as pleaded or as the Court may deem proper; and

4

g)     For an order awarding the Plaintiff, the Class, and the California

5
         Subclass their reasonable attorneys' fees, expenses, and costs of suit.

6

## **JURY DEMAND**

7

Plaintiff demands a trial by jury on all causes of action and issues so triable.

8

9
Dated:  February 20, 2020       **BURSOR & FISHER, P.A**.

10
                           By:  *  /s/ Brittany S. Scott    *

11
                                 Brittany S. Scott

12
                         L. Timothy Fisher (State Bar No. 191626)

13
                         Blair E. Reed (State Bar No. 316791)
                         Brittany S. Scott (State Bar No. 327132)

14
                         1990 North California Blvd., Suite 940
                         Walnut Creek, CA 94596

15
                         Telephone: (925) 300-4455

16
                         Facsimile:  (925) 407-2700
                         E-mail: ltfisher@bursor.com

17
                                      breed@bursor.com

18
                                      bscott@bursor.com

19
                         **BURSOR & FISHER, P.A.**
                         Scott A. Bursor (State Bar No. 276006)

20
                         2665 S. Bayshore Dr., Suite 220
                         Miami, FL 33133-5402

21
                         Telephone: (305) 330-5512

22
                         Facsimile: (305) 676-9006
                         E-Mail: scott@bursor.com

23
                         *Attorneys for Plaintiff*

24

25

26

27

28

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, Brittany S. Scott, declare as follows:

1. I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court. I am an associate at Bursor & Fisher, P.A., counsel of record for Plaintiff in this action. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2. The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Central District of California.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed at Walnut Creek, California this 20th day of February, 2020.


                                        */s/ Brittany S. Scott*
                                        Brittany S. Scott